

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AB/CMP/RJN

*271 Cadman Plaza East*

*Brooklyn, New York  11201*

November 8, 2010

By ECF

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Christopher Curanovic
           Criminal Docket No. 08-240 (S-5) (BMC)

Dear Judge Cogan:

      The government respectfully submits this letter in response to the defendant Christopher Curanovic's sentencing submission, dated October 30, 2010 ("Def. Letr."). Curanovic's sentencing is currently scheduled for November 12, 2010 at 9:30 a.m. The defendant was convicted on July 7, 2010 after a jury trial on Counts One, Eight, Nine and Eleven through Sixteen of the superseding indictment ("S-5"). Count One charged the defendant with racketeering conspiracy in violation of 18 U.S.C. § 1962(d). Count Eight charged the defendant with robbery conspiracy in violation of 18 U.S.C. § 1951(a), and Count Nine charged the defendant with the unlawful use of a firearm in connection with that robbery in violation of 18 U.S.C. § 924(c)(1)(A)(ii).[1] Counts Eleven through Fourteen charged the defendant with the unlawful extension and collection of credit and unlawful extension and collection of credit conspiracy in violation of 18 U.S.C. §§ 892(a) and 894(a)(1). Counts Fifteen and Sixteen charged the defendant with extortion and extortion conspiracy in violation of 18 U.S.C. § 1951(a).

      The defendant seeks a sentence of no more than five years, based on his alleged difficult upbringing, the death of

---

    [1]    The defendant was convicted of the unlawful possession of a firearm in connection with the robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(i), but not with brandishing the gun during the robbery, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).

his brother and his otherwise law-abiding life.  For the reasons set forth below, the government opposes the defendant's motion.

I.   Background

Considerable evidence of the defendant's involvement with the Colombo Organized Crime Family, his association with John "Sonny" Franzese ("Sonny Franzese"), the underboss of the Colombo family, and the defendant's criminal activities was presented at trial.  The evidence, summarized below, included consensual recordings of Curanovic and his co-conspirators, witness testimony including cooperating witness Besnik Neza, eyewitness Gene Kendrick and victim Bruce Peter DuPre, bank records, telephone and cell site records and surveillance photographs.

   A.   Curanovic's Involvement in the Racketeering Enterprise

Besnik Neza, a cooperating witness, testified at trial regarding Curanovic's involvement in the Colombo Family and, in particular, with Sonny Franzese and Orlando Spado.  Neza described how Curanovic had explained to him that Sonny Franzese held a high position in the Colombo family and was to receive a portion of the proceeds of whatever crimes Curanovic and Neza committed.  Trial Tr. 1004:1-7.  In particular, with respect to the robbery conspiracy discussed below, Neza explained that Curanovic and Spado discussed that any money earned would be shared with Sonny Franzese.  Trial Tr. 997:25-998:1-3. Neza further testified about when Curanovic became a part of Sonny Franzese's crew.  Trial Tr. 1003: 9-13.  According to Neza's testimony, Curanovic was excited to be part of the crew because Curanovic thought it was a money-making opportunity.  Consensual recordings with cooperating witness Gaetano Fatato provided further proof of Curanovic's association with Sonny Franzese, Orlando Spado and the Colombo family.

   B.   The Robbery Conspiracy

Overwhelming evidence was presented at trial of Curanovic's involvement in the conspiracy to rob one of Orlando Spado's drug associates, Dahomey Smith.  Neza testified in detail regarding Spado's proposal of the robbery, the robbery plan and the events of May 19, 2006, the day of the robbery.  To summarize, after Spado proposed the robbery, it was decided that Curanovic and Neza would impersonate law enforcement officers in order to gain entry into Smith's house. Curanovic purchased DEA hats and shirts from a store in Chinatown and downloaded a search warrant form from the internet for that purpose.  Trial Tr. 1010-

1011.  Curanovic also bought zip ties in order to restrain anyone who might be home during the robbery. Trial Tr. 1020:1-24.

On May 18, 2006, Curanovic and Neza flew to California and met with Spado to finalize the robbery plans.  Curanovic, Neza and Spado removed the license plate from the rental car that they used to commit the robbery.  Spado also provided Curanovic with the revolver that he later used during the attempted robbery.  The next day, Neza and Curanovic drove together to Smith's house to complete the robbery while Spado drove around in order to look for possible police presence.  Neza explained that Curanovic had Spado's gun in his hand when they knocked on the door of Dahomey Smith's house.  After she opened the door and started reading the fake search warrant that Curanovic presented, Neza and Curanovic pushed their way into the house and Neza held Smith down on the floor.  Shortly thereafter, Curanovic heard someone dialing 911, and he and Neza ran out of the house, leaving the zip ties behind.  They drove to a nearby dumpster and disposed of the gun. Trial Tr. 997-998; Trial Tr. 1009-10026.

Neza's testimony was corroborated by the victim's 911 call, phone records, and the eyewitness testimony of Gene Kendrick who described the car that Neza and Curanovic drove to commit the robbery and identified Curanovic as one of the men he saw running out of Smith's house. Trial Tr. 984-989.  Moreover, the evidence included Curanovic's own statements to Fatato, in which he bragged about his role in the robbery.  Curanovic's description fully corroborates Neza's testimony.  In his description of the robbery, Curanovic admitted, among other things that: (1) he wore DEA clothing and used a fake search warrant; (2) he carried a gun; and (3) Neza held the victim down. Curanovic stated:

> Meanwhile I'm in the street, listen to this, I don't know if I ever told you this.  I got to the Escalade.  I'm in the street.  I pulled up somewhere in Hollywood Hills, in the fuckin' mountain, took off all my clothes and put different clothes on.  I had everything, um, so I threw everything in the garbage.  I had that DEA shirts, everything, the search warrant –
>
> ****
>
> So then Nick grabs her he, he's on the floor with her holding her mouth and she, she's, and she was screaming like, she got loose,

> she screaming like somebody to, to call the police. Now I have a fuckin' gun. I'm going, uh, and when I went upstairs, this fuckin', see you know.
>
> \*\*\*\*
>
> I don't give a shit, but, uh, he was on the phone. He's goes, "911, emergency, emergency." Awww...I say, the fuck out of here. I said, Nick, come on, we got everything out of the car and, um, we were jumping, we were going in the car and she was like right behind us, so I turn around with the gun, like this, she was like, oh, and I jump in the car, the Escalade, and I fucking took off. Fuckin' jumped back on that Hollywood Boulevard.

Govt. Exs. 210 and T210B.

Finally, the evidence at trial demonstrated that this robbery also formed part of the racketeering conspiracy, as both Neza's testimony and consensual recordings of Spado showed that Curanovic intended to share the proceeds with Colombo family underboss Sonny Franzese. According to Neza's testimony, Spado, Curanovic and Neza had discussed the breakdown of the robbery proceeds and "the conclusion was four ways, one for myself, one-fourth, one-fourth for Chris, one-fourth for Orlando, and one-fourth for Guy and Sonny." Trial Tr. 998: 1-3.

    C.    <u>Extortionate Extension and Collection of Credit</u>

The evidence at trial also proved that Curanovic and Sonny Franzese made an extortionate extension of credit to Vincent Michaels, and used extortionate means to collect the money owed. Consensual recordings made by Fatato of his conversations with Curanovic and Franzese, Curanovic's bank records showing a withdrawal of $6,500 on the same day that part of the loan was extended to Michaels, surveillance photographs and the testimony of Special Agent Vincent Dagostino supported this charge. After extending the loan, Curanovic confronted Michaels in a bar where Michaels worked to let Michaels know that Curanovic had helped fund the loan. Curanovic's confrontation of Michaels was meant to intimidate and to imply that his safety was at risk if he failed to make the loan payments. After taking the loan, Michaels made regular interest payments of $400 per week from approximately October 2006 through March 2007, paying a

4

total of approximately $8,800 to Curanovic and Sonny Franzese. Trial Tr. 1167-1175; 1204-1205; 1207-1209.

D. Extortion

Curanovic's extortion of Bruce Peter DuPre, the owner of Rue B, a restaurant and bar in Manhattan, New York is perhaps the clearest example of how dangerous and violent Curanovic is. The evidence at trial established that Curanovic cornered DuPre in his office after breaking down the office door. Trial Tr. 1419:15-24. Curanovic then demanded that DuPre make weekly payments from the proceeds of his bar, and told DuPre that if he failed to cooperate, Curanovic would beat DuPre and break his legs. Specifically, DuPre testified that Curanovic threatened, "he would be very happy to come and give me a beating, throw me a beating, and break my leg and that he would like nothing more than to beat the crap out of me." Trial Tr. 1426:2-6. Prior to making this threat, Curanovic used a screwdriver as a weapon in an attempt to stab DuPre's hand. Luckily, Curanovic missed and stabbed DuPre's desk instead. Curanovic's action was forceful enough to gouge the desk, indicating that DuPre would likely have suffered serious physical harm had Curanovic succeeded in stabbing DuPre's hand.

This extortion involved more than a single violent episode. When DuPre tried to hide from Curanovic, Curanovic left a note as Rue B to intimidate DuPre further. Trial Tr. 1431. Subsequently, when Curanovic came to the bar to collect one of his weekly payments, Curanovic pinned DuPre's partner to the doorframe and threatened him with a knife. Trial Tr. 1434:11-24. DuPre then sought the assistance of law enforcement and was provided with the money to make the weekly payments to Curanovic. Between March and June of 2007, Curanovic and his co-conspirator collected $6,000 from DuPre.

II. The Presentence Investigation Report

On September 3, 2010, the Probation Department issued its Presentence Investigation Report ("PSR"). According to the PSR, the defendant's total offense level is 30. PSR ¶ 102. Based on a criminal history category of I, the advisory Guidelines range set forth in the PSR is 97 to 121 months for Counts One, Eight and Eleven through Sixteen. PSR ¶ 143. In addition, the PSR notes that Count Nine carries a mandatory minimum sentence of seven years that must run consecutive to any other term of imprisonment that is imposed. PSR ¶ 143.

The government respectfully submits that the following corrections be made to the PSR. First, with respect to the robbery conspiracy (Racketeering Acts 5A and 5B and Count 8), the PSR included the following enhancements: four points based on an intended loss amount of over $800,000; two points for bodily injury; and two points for restraint of the victims. PSR ¶ 74. The government agrees with defense counsel's objection to the enhancements for loss amount over $800,000[2] and bodily injury.[3] However, the government respectfully submits that an additional two point enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 applies, because Curanovic removed the license plate from the car used during the robbery and disposed of the gun and the DEA clothing, all in order to avoid detection by law enforcement. Therefore, according to the government's calculation, the total offense level for the robbery conspiracy is 24.

Second, with respect to the extortion of DuPre (Count 15 and 16), the PSR included an enhancement for threats to cause physical injury, but did not include an enhancement for the use of a dangerous weapon, pursuant to U.S.S.G. § 2B3.2(b)(3)(iv). The government respectfully submits that this four-point enhancement applies because, as described above, Curanovic used a knife to threaten DuPre's business partner and a screwdriver to threaten DuPre, and only narrowly missed gouging DuPre's hand with it. Therefore, according to the government's calculation, the total offense level for the extortion and extortion conspiracy is 24.

Third, with respect to the extortion of Vincent Michaels (Racketeering Acts 8A-D, Counts 11-14), the PSR states, "Curanovic threatened Michaels with bodily injury if the money was not repaid." PSR ¶ 52. This enhancement is appropriate. Although Curanovic's threat to Michaels was less explicit than his threats to DuPre, his reaction when Michaels sent him a bill

---

[2] The proof regarding the amount of money that Curanovic and his co-conspirators intended to steal consisted of the testimony of Besnik Neza, who stated, "[f]rom what I remember, I think somewhere around like a million dollars, something like that. I don't know for sure." Trial Tr. 1064: 20-21.

[3] The PSR states that "the Government advised that one of the victims of the Robbery offense, Dahomey Smith, suffered some minor cuts and bruising." PSR ¶ 67. However, the government does not have any information regarding injuries suffered by the victim.

6

for the drinks he consumed at Michaels' bar was unmistakably threatening: "So he grabs me, and goes, 'I don't know if you know who I am. But I did a favor for you.'" Govt. Ex. T228 (Michaels' statement to Fatato, February 8, 2007). This statement, coupled with Curanovic's close affiliation with Franzese, could only be interpreted as a threat of bodily injury.

With these corrections, the grouping analysis pursuant to Section 3D1.3 and 3D1.4 of the Guidelines is as follows:

| Acts/Counts | Units |
|---|---|
| Count One<br>(Robbery Conspiracy<br>Racketeering Acts 5A and 5B and Count 8)<br>Adjusted Offense Level: 24 | 1 |
| Count One<br>(Extortionate Extension and Collection of Credit<br>(Racketeering Acts 8A-D, Counts 11-14)<br>Adjusted Offense Level: 20 | 1 |
| Counts 15 and 16<br>(Extortion)<br>Adjusted Offense Level: 24 | 1 |

Highest Adjusted Offense Level:   24

Total Number of Units:   3

Total Units Added:   3

Adjusted Offense Level:   27

With a criminal history category of I, an offense level of 27 corresponds to a range of imprisonment of 70 to 87 months.

Finally, the PSR states that Curanovic's conviction on Count Nine carries a seven year (84 month) mandatory term of imprisonment that must run consecutive to any other term of imprisonment that is imposed. PSR ¶¶ 142 and 143. In fact, Curanovic was convicted of possession of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i), but was not convicted of brandishing the firearm in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Therefore, Count Nine carries a five year (60 month) mandatory term of imprisonment that must run consecutively to any other term of imprisonment that is imposed.

III. <u>Sentencing</u>

Curanovic argues that the enhancements applied to the robbery conspiracy are improper. Def. Letr. at 2. He further argues that he should receive a sentence of no more than five years, because: (1) he had a difficult childhood; (2) has led a law-abiding life except for the crimes for which he was convicted; and (3) faces pending charges in federal court in New Jersey. For the reasons set forth below, the government respectfully submits that Curanovic deserves a sentence at the top of the advisory Guidelines range, in addition to the required five year mandatory term of imprisonment that applies to his unlawful use of a firearm.

A.   <u>The Enhancements for the Robbery Conspiracy</u>

As noted above, the government agrees that the enhancements for loss amount above $800,000 and for bodily injury do not apply. However, the government respectfully submits that the enhancement for restraint of the victim applies and that an additional enhancement for obstruction of justice is also warranted.

The evidence as to whether or not the victim was "restrained" pursuant to Guideline 2B3.1(b)(4)(B) (PSR ¶ 32) consists of Neza's trial testimony as well as Curanovic's own statements to Fatato. Neza testified: "I had pushed her inside and I guess she had tripped over the -- the couch that was leading there and when she was on the ground I was over her just trying to hold her down, telling her we are here, please calm down." Trial Tr. 1024: 19-23. Moreover, during a consensual recording with Fatato, Curanovic stated, "Nick [referring to Besnik Neza] grabs her, he, he's on the floor with her holding her mouth." Contrary to the statements in the defendant's sentencing letter (Def. Letr. at 2), the government never conceded at Spado's plea proceeding that the enhancement for restraint of the victim did not apply to Curanovic.

The evidence supporting the obstruction of justice enhancement consists of Neza's testimony as well as Curanovic's own statements to Fatato. Neza explained that they removed the license plates from the rental car and disposed of the gun and DEA clothing. "We had -- first of all, when we first got to the area, I had realized it was across the street from the WB Studios and I see a camera, so what we discussed was we were going to take off the license plates when we got to that area so no one could track down and get the license plate numbers of the vehicle." Trial Tr. 1016:3-8. Neza then testified that after

the robbery, "we drove to a dumpster where we had put the license plate back on.  We took off the shirts and the hats so we were like in the A shirts.  I am not sure -- like the undershirts, regular white shirts.  And we had thrown that and the gun into a dumpster.  I don't even know where."  Trial Tr. 1024:23-1025:3.  Curanovic likewise acknowledged disposing of the evidence, telling Fatato, "I'm in the street.  I pulled up somewhere in Hollywood Hills, in the fuckin' mountain, took off all my clothes and put different clothes on.  I had everything, um, so I threw everything in the garbage.  I had that DEA shirts, everything, the search warrant. . . ."  Gov. Exs. 210 and T210B.

    B.   <u>A Sentence at the Top of the Advisory Guidelines is Appropriate</u>

       Curanovic argues that he should not receive any additional term of imprisonment above the five years required by statute for his conviction of the unlawful use of a firearm in connection with a robbery.  Def. Letr. at 6.  Curanovic points to his difficult childhood and the death of his brother in support of this argument.  Def. Letr. at 5.  He also argues that he should receive a downward departure based on aberrant behavior, pursuant to "the spirit of" U.S.S.G. § 5K2.20.  Finally, he argues that the Court should reduce his sentence because of his pending case in New Jersey.

       While the defendant's childhood and the loss of his brother are certainly factors for the Court to consider under 18 U.S.C. § 3553, these circumstances do not warrant the sentence that the defendant now seeks.  <u>See</u> U.S.S.G. 5H1.12 ("[l]ack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted.") Indeed, Curanovic acknowledges that despite his difficult childhood and the tragic death of his brother, he was able to complete his college degree, graduating from Fordham University in 2004.  Def. Letr. at 5.  Yet, despite having a college degree and the means to support himself, Curanovic nevertheless engaged in the violent criminal acts described above.  Curanovic, and not his father or the death of his brother, are to blame for his crimes.

       The defendant acknowledges that the provision for aberrant behavior in the Guidelines (Section 5K2.20) does not apply to the facts of this case, but urges the Court to consider the "spirit" of this provision.  Def. Letr. at 6.  Neither the actual provision, nor its spirit, warrants a reduction in this case.

A reduction in sentence is warranted on the basis of aberrant behavior "only if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20(b). In promulgating Section 5K2.20, the Sentencing Commission noted that, "[a]s a threshold matter, this [Section] provides that departure is available only in an extraordinary case." United States v. Gonzalez, 281 F.3d 38, 44 (2d Cir. 2002)(quotation omitted).

As detailed above, Curanovic has been convicted of several crimes, not one. For that reason alone, the aberrant behavior reduction is not available to him. Moreover, each of these crimes involved significant planning and were of substantial duration. The defendant argues that the Court should consider the spirit of this provision because the period of criminal activity charged in S-5 is aberrant to the years preceding it. Def. Letr. at 6. This is besides the point. As the defendant himself concedes, his criminal activity spanned "a multi-year period." Id. Moreover, the defendant's submission fails to address the particularly violent nature of some of Curanovic's actions. This Court recognized the danger that Curanovic poses during Spado's sentencing proceeding: "It was purely fortuitous that no one got hurt in this attempted robbery. When you bring in somebody like Mr. Curanovic, it's just a wild card. There's no telling what's going to happen." Spado Sentencing Tr. at 18.

Curanovic's extortion of the owner of Rue B is a particularly disturbing example of Curanovic's violent conduct. Curanovic repeatedly terrorized DuPre. As described above, first, Curanovic threatened DuPre with a screwdriver, coming within centimeters of stabbing DuPre's hand into his desk. Then, Curanovic left a threatening note for DuPre when DuPre tried to hide from Curanovic. Finally, in DuPre's presence, Curanovic threw DuPre's partner against a door and held a knife to him while DuPre retrieved one of the weekly payments Curanovic demanded. This kind of behavior simply does not warrant a reduction based on either the letter or the spirit of the aberrant behavior provision.

The defendant also urges the Court to consider the possible sentence he faces as a result of his pending case in the United States District Court, District of New Jersey. Def. Letr. at 8. Curanovic has not yet been convicted in that district, and thus, it is impossible to predict what sentence he might receive

10

in New Jersey.  It would be premature to reduce Curanovic's sentence in the instant matter based on an attempt to estimate the sentence he could receive in New Jersey.  Moreover, the facts of his case in New Jersey are entirely unrelated to the matter here.  Thus, there is no basis for reducing Curanovic's sentence based on his pending case in New Jersey.[4]

IV. Conclusion

For these reasons, the government respectfully submits that a sentence of imprisonment at the high end of the guidelines of 70 to 87 months, to run consecutive with the five year mandatory term of imprisonment, is appropriate in this case.

> Respectfully submitted,
>
> LORETTA E. LYNCH
> United States Attorney
>
> By:  /s/ Rachel J. Nash
>      Rachel J. Nash
>      Cristina M. Posa
>      Assistant U.S. Attorneys

cc:  Marion Seltzer, Esq. (via email and ECF)
     Frank Marcigliano, U.S. Probation

---

[4] Curanovic continues to imply that he is somehow being treated unfairly by the government because he faces unrelated charges in both districts.  Contrary to the defendant's assertion, this office never agreed to transfer the case in New Jersey to the Eastern District of New York.

11